RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KATHRYN A. PRICE, et al.,

　　　　　　　　　　*Plaintiffs-Appellees,*

　　　*v.*

MEDICAID DIRECTOR, Office of Medical Assistance, et al.,

　　　　　　　　　　*Defendants-Appellants.*

No. 15-4066

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:13-cv-00074—Karen Litkovitz, Magistrate Judge.

Argued: April 28, 2016

Decided and Filed: September 30, 2016

Before: BOGGS and KETHLEDGE, Circuit Judges; STAFFORD, District Judge.[*]

---

## COUNSEL

**ARGUED:** Jeffrey Clair, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Amicus Curiae. Jeffrey P. Jarosch, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Eric M. Carlson, JUSTICE IN AGING, Los Angeles, California, for Appellees. **ON BRIEF:** Jeffrey Clair, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Amicus Curiae. Jeffrey P. Jarosch, Cheryl R. Hawkinson, Amy R. Goldstein, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Eric M. Carlson, JUSTICE IN AGING, Los Angeles, California, Anna M. Rich, JUSTICE IN AGING, Oakland, California, Janet E. Pecquet, Peter L. Cassady, Ashley S. Burke, BECKMAN WEIL SHEPARDSON LLC, Cincinnati, Ohio, for Appellees. Carol Rolf, ROLF GOFFMAN MARTIN LANG LLP, Cleveland, Ohio, William J. Browning, BROWNING & MEYER CO., LPA, Worthington, Ohio, for Amici Curiae.

---

[*]The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

---

**OPINION**

---

KETHLEDGE, Circuit Judge.   Ohio offers assisted-living coverage to its Medicaid beneficiaries on a prospective basis.  The plaintiffs here, a class of Ohio Medicaid beneficiaries, sued Ohio's Medicaid administrators on the claim that federal law requires Ohio to cover certain assisted-living services retrospectively.   The district court granted summary judgment to the plaintiffs.  We reverse.

I.

A.

In 1965, Congress used its Spending Clause power to establish Medicaid.  *See* U.S. Const. art. I, § 8, cl. 1.  Through Medicaid, the federal government gives money to the States for the purpose of paying the medical costs of people "whose income and resources are insufficient to meet the costs of necessary medical services[.]"  42 U.S.C. § 1396-1.  The money comes with strings attached.  "Like other Spending Clause legislation, Medicaid offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions."  *Armstrong v. Exceptional Child Ctr., Inc.,* 135 S. Ct. 1378, 1382 (2015).

Per Congress's conditions, all State Medicaid plans must apply uniformly statewide, provide medical assistance equally "in amount, duration, [and] scope" among Medicaid beneficiaries, and establish a "single standard to be employed in determining" eligibility for medical assistance among different classes of beneficiaries.  *See* 42 U.S.C. §§ 1396a(a)(1), (a)(10)(B), (a)(10)(C)(i)(III).  In 1981, however, Congress recognized that these requirements needlessly diverted many Medicaid beneficiaries into impersonal and expensive long-term residence at hospitals, nursing homes, and intermediate-care facilities, without regard to whether less-intensive forms of care—such as assisted-living services—might meet an individual beneficiary's medical needs.  *See* Mary Jean Duckett & Mary R. Guy, *Home & Community-Based Services Waivers*, 22 Health Care Fin. Rev. 123 (2000).

Since 1981, therefore, Congress has allowed the Secretary of Health and Human Services to waive the uniformity and equal-provision conditions for States that pay the cost of "home or community-based services (other than room and board)[.]" 42 U.S.C. § 1396n(c)(1). Under an approved waiver plan, a State may provide "community-based" health services (which include assisted-living services) to Medicaid beneficiaries "with respect to whom there has been a determination that but for the provision of such services the [beneficiaries] would require the level of care provided in a hospital or a nursing facility . . . the cost of which could be reimbursed under the State [Medicaid] plan." *Id.* Per such waiver plans, therefore, States may provide beneficiaries with assisted-living services rather than more-intrusive (and expensive) nursing-home services. In return for this flexibility, the State must individually evaluate Medicaid beneficiaries regarding their "eligib[ility] for such home or community-based care[.]" *Id.* § 1396n(c)(2)(B)(iii). In addition, the State may cover only community-based services—such as assisted-living services—that have been provided "pursuant to a written plan of care[.]" *Id.* § 1396n(c)(1).

In 2006, the State of Ohio applied for and received a Medicaid waiver to provide assisted-living services to low-income seniors. Ohio Ctrs. for Assisted Living Br. at 6. Under Ohio's Medicaid regulations, a senior wishing to benefit from the waiver program must satisfy several criteria, including a determination by a county-level "passport" agency that the senior's "health related needs . . . can be safely met" in a state-approved assisted-living facility (as opposed, for example, to a nursing home). Ohio Admin. Code 5160-33-03(B)(9). Per Congress's conditions on Medicaid funding through the assisted-living waiver, Ohio's county-level passport agencies will enroll a senior into the waiver program only after the senior meets several eligibility requirements, including approval of the senior's "service plan" by the county passport agency. Ohio Admin. Code 173-38-03(C)(1)(b); *see also* Ohio Admin. Code 173-38-01(B). Ohio does not permit the disbursement of any Medicaid funding for waiver-program services rendered before the passport agency approves the service plan. *See* Ohio Admin. Code 173-38-03(C)(1)(c).

B.

1.

In 2008, Betty Hilleger—then suffering from dementia, heart problems, and arthritis—moved into The Lodge Care Center, an assisted-living facility in Cincinnati. During her first four years at The Lodge, Hilleger paid the center's $4,300 monthly fee out of her own pocket. Then she ran out of money, and her daughters began paying the center's fee. In October 2012, Hilleger applied for Medicaid assistance through Ohio's assisted-living waiver program. Soon thereafter, her local passport agency approved a service plan for her. Later, in January 2013, the agency determined that Hilleger was financially eligible for the waiver program. Medicaid then began paying for the costs of Hilleger's care at The Lodge.

In April 2012, Geraldine Saunders checked into a hospital and then a rehabilitation facility after suffering a fall. Her stress fractures and worsening dementia prevented her from returning home. In June 2012, she moved into the Close to Home assisted-living center in Ironton, Ohio. The same day, she applied for Medicaid assistance through Ohio's assisted-living waiver program. Eighteen days later, the local passport agency approved her service plan, determined that she was otherwise eligible for benefits under the program, and authorized the payment of Medicaid benefits. Saunders's daughter paid the 18 days' worth of assisted-living costs between the time Saunders entered Close to Home and the time her service plan was finalized.

2.

In February 2013, Hilleger and Saunders—acting through their daughters, Marilyn Wenman and Kathryn Price, respectively—sued the director of Ohio's Medicaid program and the director of the Ohio Department of Aging in a putative class action in federal district court. The plaintiffs alleged that Ohio's omissions of Medicaid coverage for the first 18 days of Saunders's assisted-living costs, and for the first three months of Hilleger's assisted-living costs, were in violation of federal law. The plaintiffs sought declaratory and injunctive relief under 42 U.S.C. § 1983 on behalf of themselves and others similarly situated. They specifically alleged that, per 42 U.S.C. § 1396a(a)(34), Ohio must retroactively cover the assisted-living

services for a waiver-program beneficiary for up to three months before the beneficiary applies for coverage under the program. Section 1396a(a)(34) requires States to offer Medicaid coverage to any beneficiary

> for care and services included under the [Medicaid] plan and furnished in or after the third month before the month in which [the beneficiary] made application . . . for such assistance if such [beneficiary] was (or upon application would have been) eligible for such assistance at the time such care and services were furnished.

The plaintiffs asserted that they were eligible for Medicaid assistance under Ohio's waiver program from the moment each of them took up residence at their assisted-living centers, and that they were therefore entitled to retroactive benefits (*i.e.*, payments for services provided *before* a passport agency's approval of their service plans) under § 1396a(a)(34). The plaintiffs asked the district court to enter a declaratory judgment that Ohio's waiver program violated § 1396a(a)(34). They also asked the district court to enjoin the defendants from "artificially delaying" payment of the plaintiffs' assisted-living benefits, and to provide class members with written notice of their right to a state hearing as to their eligibility for retroactive benefits.

In November 2014, the plaintiffs amended their complaint and added two more claims under § 1983: that the defendants failed to comply with the notice requirements of 42 U.S.C. § 1396a(a)(3); and that the defendants failed to provide Medicaid assistance with reasonable promptness, in violation of 42 U.S.C. § 1396a(a)(8).

In September 2015, the district court certified the plaintiffs' proposed class of Medicaid beneficiaries and granted summary judgment to the plaintiffs. The court held that federal law required Ohio to "assess whether, at any time up to three months prior to [an] application for assisted living waiver benefits, the [applicant] met the financial eligibility benefits; whether the [applicant] had a need for intermediate or skilled level of care; and whether the [applicant] received supportive services consistent with the plan of care. If so, the State must grant retroactive assisted living waiver benefits in accordance with § 1396a(a)(34)." The court also held that the defendants had violated their duties under federal law to provide notice of the plaintiffs' hearing rights and to provide Medicaid coverage reasonably promptly. In addition, the court declared that the defendants were obligated, going forward, to provide Medicaid assisted-

living coverage to eligible beneficiaries for up to three months prior to the date of their applications. Finally, the court ordered the defendants to identify and provide all members of the class with written notice "of the state administrative procedure" available "to have defendants determine whether or not they may be eligible for additional days of Medicaid assisted living waiver coverage."

This appeal followed.

## II.

## A.

The defendants argue that the plaintiffs lack standing to sue and that the district court thus should have dismissed their complaint. We review de novo whether the plaintiffs have standing. *See Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008).

Standing has three elements. First, the plaintiff must show that she has suffered an "injury in fact": that is, some invasion of her legal interests that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, she must show that there is a "causal connection" between her injury and the defendant's actions. *Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561.

The defendants focus on the third element here, arguing that the plaintiffs lack standing because the relief awarded by the district court cannot redress the named plaintiffs' injuries. As to the claim asserted in the plaintiffs' original complaint, that relief took two forms: first, a declaration that the plaintiffs were entitled to an award of assisted-living benefits for up to three months of assisted-living services provided before the date of their application for benefits, even though a passport agency had not approved their service plans before that date; and second, as ancillary relief, notice to class members of their right to an administrative hearing under state law (a hearing that might in turn lead to an award of retroactive benefits for a beneficiary). The defendants argue that neither form of relief can do the named plaintiffs any good, because (under the Eleventh Amendment, as discussed below) the plaintiffs cannot use the declaration to obtain

an award of damages in federal court; instead, they can use it only to obtain an award of benefits in a state administrative hearing as to whether they were entitled to more benefits than they in fact received. And under state law that hearing is available for only a limited time: Ohio gives Medicaid beneficiaries 90 days to request a state administrative hearing to challenge or adjust a Medicaid benefits determination. *See* Ohio Admin. Code 5101:6-3-02(B)(2). Once that window closes, therefore, even a declaratory judgment that Hilleger and Saunders were entitled to additional benefits is useless to them as a practical matter, because they have no forum in which to wield it. And for both Hilleger and Saunders, as of this writing, that 90-day window (which began on the dates the State notified them of their award of benefits) passed long ago. Moreover, neither named plaintiff is likely to seek assisted-living benefits in the future: Hilleger passed away in September 2013 after the initiation of this lawsuit, and Saunders currently lives in a nursing home, with no sign that she will ever return to an assisted-living facility. Thus, the relief awarded by the district court—the declaration of entitlement to additional benefits, and notice of a state hearing in which the plaintiffs could seek an award of those benefits—does not redress the plaintiffs' putative injuries. Hence the defendants argue that the plaintiffs lack standing.

The problem with that argument is that Hilleger's 90-day window to seek a hearing was still open when the plaintiffs filed their complaint in this case. (Saunders's 90-day window was closed by then.) And the fact that Hilleger's window remained open, in turn, implicates a rule unique to class actions: in cases where the claims asserted on behalf of the class are "so inherently transitory" that the named plaintiff's claims will "expire" before the district court can even rule on a motion for class certification, the plaintiff is deemed to have standing to sue—notwithstanding that her claim has "expired," *i.e.*, that the relief available for the claim can no longer do her any good—so long as she had standing to sue "at the time the . . . complaint was filed[.]" *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51-52 (1991). (The idea behind the rule is that, if the district court had granted a motion for class certification before the plaintiff's claim expired, the unexpired claims of other class members would then carry the torch for standing purposes; and it is hardly the plaintiff's fault that the district court could not rule upon that motion before her "inherently transitory" claims expired. *See Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1531 (2013).) Hilleger meets that test here—at the time she filed her

complaint, 60 days of her 90-day period to seek a hearing still remained—and thus she does have standing to assert the claim set forth in her original complaint.

But the same is not true of the claims asserted in the amended complaint. We determine standing for each plaintiff on a claim-by-claim basis; "standing is not dispensed in gross." *Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008). The plaintiffs have standing to assert only the claims they had standing to assert when the claims themselves were first pled. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004). And by November 2014—when the plaintiffs first pled, in their amended complaint, that the defendants breached their duties under 42 U.S.C. §§ 1396a(a)(3) and 1396a(a)(8)—even Hilleger had long since run out of time to request a State Medicaid hearing. Thus, at that time, Hilleger's claims could not be redressed by any of the relief she sought. Both Hilleger and Saunders therefore lack standing to sue on the claims asserted for the first time in their amended complaint.

In sum, the plaintiffs have standing to pursue only their February 2013 claim that the defendants failed to comply with federal law by refusing to award retroactive assisted-living benefits under 42 U.S.C. § 1396a(a)(34). The district court erred when it concluded that the plaintiffs have standing to sue on their other claims.

B.

The defendants argue that the Eleventh Amendment bars the plaintiffs' remaining claim for relief. We review de novo the defendants' entitlement to sovereign immunity under the Eleventh Amendment. *Babcock v. Michigan*, 812 F.3d 531, 533 (6th Cir. 2016). Under that Amendment, the plaintiffs may not sue a state in federal court for "retroactive monetary relief." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103 (1984).

Yet the federal courts must also ensure that state officers meet their obligations under federal law. Thus, a federal court may, without violating the Eleventh Amendment, issue a prospective injunction against a state officer to end a continuing violation of federal law. *See Ex parte Young*, 209 U.S. 123, 159 (1908). More to the point here, in suits concerning a state's payment of public benefits under federal law, a federal court may enjoin the state's officers to comply with federal law by awarding those benefits in a certain way going forward—even if the

court may not order those officers to pay out public benefits wrongly withheld in the past. *See Edelman v. Jordan*, 415 U.S. 651, 667-68 (1974). And the court may order state officers to provide recipients of public benefits with notice of the court's prospective injunction (to award benefits in a certain way going forward) and of the beneficiaries' right to pursue state administrative remedies to obtain benefits in accordance with that injunction—even if that notice "will lead inexorably to the payment of state funds for retroactive benefits." *Quern v. Jordan*, 440 U.S. 332, 347 (1979).

Here, the plaintiffs sought (and the district court ordered) prospective relief in the form of an injunction directing the defendants, Ohio's Medicaid administrators, to cease their practice of providing waiver-program benefits only for the period following an eligibility determination, in purported violation of 42 U.S.C. § 1396a(a)(34). That is the kind of prospective injunctive relief that *Ex parte Young* squarely permits. The district court also ordered the defendants to notify class members of the court's injunction and of their right to use Ohio's administrative procedures to obtain any past Medicaid benefits to which the plaintiffs might be entitled under the injunction. That makes this order no different than the one the Supreme Court permitted in *Quern*. There, the order "simply inform[ed] class members that their federal suit [was] at an end, that the federal court [could] provide them with no further relief, and that there [were] existing state administrative procedures which they may wish to pursue." *Quern*, 440 U.S. at 349. The district court's order here provides the same kind of notice the order in *Quern* did. Thus, the district court's order did not abridge Ohio's sovereign immunity.

The defendants argue that the district court's order violates the Eleventh Amendment because the order might be construed as commanding the defendants to "redo past eligibility determinations" or to make hearings available to class-members who have no right to a hearing under state law. Defs.' Br. at 19-25. But we do not read the order that way. The court ordered the defendants to "advis[e] [the plaintiffs] of the state administrative procedure, compliant with due process requirements, available if [the plaintiffs] desire to have defendants determine whether or not they may be eligible for additional days of Medicaid assisted living waiver coverage." In our view that order does not require anything other than notice of currently available state procedures. That notice might result in new eligibility determinations for class

members who are still entitled to a hearing under state law, and thus might ultimately lead to payment of benefits that are past due. But that result is consistent with *Quern*. The Eleventh Amendment therefore does not bar the plaintiffs' claim to injunctive relief.

C.

Finally, the defendants argue that the district court misconstrued 42 U.S.C. § 1396a(a)(34), which they contend does not require Ohio to pay benefits for assisted-living services rendered before a beneficiary obtains approval of his service plan. On this point the United States supports the defendants as *amicus curiae*, arguing that federal law in fact prohibits Ohio from offering Medicaid payments for assisted-living services that are rendered before a beneficiary's service plan is approved.

We review de novo the district court's interpretation of § 1396a(a)(34). *See Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 799 (6th Cir. 2015). Under § 1396a(a)(34), states must offer Medicaid assistance to all beneficiaries

> for care and services included under the [Medicaid] plan and furnished in or after the third month before the month in which [the beneficiary] made application . . . for such assistance if such [beneficiary] was (or upon application would have been) eligible for such assistance *at the time such care and services were furnished.*

(emphasis added). Thus, under § 1396a(a)(34), the plaintiffs were entitled to Medicaid reimbursement for assisted-living services furnished during the three months prior to their applications only if they were eligible for an award of those benefits "at the time" those services "were furnished." *Id.*

Meanwhile, under 42 U.S.C. § 1396n(c)(1), Ohio can spend Medicaid funds only on assisted-living services that are provided "pursuant to a written plan of care[.]" Accordingly, under Ohio's implementing regulations, a prospective Medicaid beneficiary becomes "eligible" for assisted-living benefits only after, among other things, a state passport agency approves an individualized service plan for the beneficiary. Ohio Admin. Code 5160-33-03(B)(9); *see also* Ohio Admin. Code 173-38-03(C)(1)(b). The plaintiffs were thus ineligible for Medicaid assisted-living benefits before a state passport agency approved their respective service plans.

The district court was mistaken, therefore, to hold that the plaintiffs were entitled to reimbursement for assisted-living services that were provided before their respective service plans were approved. Quite the contrary: as the United States points out, the defendants would have violated federal law if they had used Medicaid funds to pay for assisted-living services provided before approval of a service plan.

Yet the plaintiffs argue (and the district court held) that the phrase "pursuant to[,]" as used in § 1396n(c)(1), is synonymous with "consistent with"; and thus, in the plaintiffs' view, they are entitled to reimbursement for assisted-living services provided *before* approval of their service plans, so long as those benefits were "consistent with" the plans later approved. The short answer to that argument is that nobody uses the phrase "pursuant to" that way. A longer answer is that "pursuant to" is not defined by the Medicaid statute, so we construe it according to its ordinary meaning, as shown by the phrase's "normal usage[.]" *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012). The phrase is normally used in legal contexts; the leading legal dictionary defines "pursuant to" as "[i]n compliance with[,]" "[a]s authorized by[,]" or "[i]n carrying out[.]" Black's Law Dictionary 1356 (9th ed. 2009). The Medicaid statute itself routinely uses "pursuant to" in precisely this way. *See, e.g.*, 42 U.S.C. § 1396a(a)(39) (noting that state Medicaid plans "shall exclude any specified individual or entity from participation in the program under the State plan for the period specified by the Secretary [of Health and Human Services], when required by him to do so *pursuant to section 1320a-7 or section 1320a-7a of this title*"); § 1396a(r)(1)(B)(i)(II) ("a State veterans home with respect to which the Secretary of Veterans Affairs makes per diem payments for nursing home care *pursuant to section 1741(a) of Title 38*"); § 1396b(u)(1)(E)(i) ("eligibility therefor was determined exclusively by the Secretary [of Health and Human Services] under an agreement *pursuant to section 1383c of this title*").

Justice Jackson likewise used "pursuant to" in precisely this sense, when he wrote that the President's "authority is at its maximum" when he "acts pursuant to an express or implied authorization of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). And for purposes of Justice Jackson's rule, and otherwise, the President cannot act "pursuant to" a statute that Congress has not yet passed. Nor can a police officer search a home "pursuant to" a warrant she obtains after the search; the Fourth

Amendment's warrant requirement would be meaningless if an officer could search first, then obtain a warrant, and then claim she acted "pursuant to" it simply because the search was consistent with the warrant's terms.

"Pursuant to" is a narrower term than "consistent with." A decision of the Supreme Court, for example, might be consistent with a decision of our court; but none of the Supreme Court's decisions are made "pursuant to" ours. "Pursuant to" means more than mere consistency; it means, in addition, that an action is directed or permitted by the authority by which the action is taken. And in no case is the Supreme Court acting at our direction or authority.

That assisted-living services are "consistent with" a service plan, therefore, does not mean that the services were provided "pursuant to" the plan. To be provided "pursuant to" a plan, the services must be *authorized* by the plan. And just as a warrant cannot authorize a search before the warrant is issued, neither can a plan authorize the provision of assisted-living benefits before the plan is approved. Under Ohio's waiver program and the relevant provisions of the Medicaid Act, therefore, assisted-living benefits can be provided "pursuant to a written plan of care[,]" 42 U.S.C. § 1396n(c)(1), only after a state passport agency approves the plan. The defendants thus complied with federal law, rather than violated it, when they declined to use Medicaid funds to pay for assisted-living services that were provided before a state passport agency approved a plan of care for the recipient of those services.

The plaintiffs' remaining argument is that the defendants' policy renders the retroactivity requirement of § 1396a(a)(34) a dead letter. But under Ohio's Medicaid regulations, a senior can seek approval of a service plan before making an application for assisted-living benefits. If a senior first contacts the local passport agency, she may receive "an in-person assessment to determine eligibility" for the assisted-living program before she submits an application for Medicaid benefits. Ohio Admin. Code 5160-33-04(A)(2). Thus, so long as an applicant anticipates in advance that she might want Medicaid coverage for assisted-living services, she can get a written plan of care approved in advance of her application. That way, if she is not yet financially eligible for Medicaid—and wants to make sure there is no "coverage gap" between the time she becomes financially eligible and the time her application is approved—she can

ensure that a service plan is in place in advance, and thereby receive benefits retroactive to the time of application if and when she applies, as provided under § 1396a(a)(34).

The Ohio Centers for Assisted Living, appearing as *amicus curiae* in support of the plaintiffs, dispute this point. They contend that submission of an application to the Ohio Department of Job and Family Services for assisted-living benefits constitutes an application for Medicaid, and that it is therefore impossible to obtain pre-application approval of a service plan. *See* Ohio Ctrs. for Assisted Living Br. at 20. But *amicus* neglects to address the regulatory provision that allows seniors to receive an "in-person [eligibility] assessment" from the local passport agency before making an application with the Department of Job and Family Services. Ohio Admin. Code 5160-33-04(A)(2). And that provision, on its face, permits seniors to obtain service-plan approvals before they apply for benefits. Ohio has thus provided a mechanism that permits Medicaid coverage for assisted-living services to be rendered before approval of the beneficiary's application, in compliance with § 1396a(a)(34). Moreover, while the defendants' policy does not abridge § 1396a(a)(34), the plaintiffs' interpretation of these provisions *would* abridge the plain terms of § 1396n(c)(1), by stripping the phrase "pursuant to" of its core meaning. Thus, as the United States has long recognized, § 1396n(c)(1) permits Medicaid funding only for assisted-living services that are authorized by a preceding service plan. *See* U.S. Br. at 16-17.

The district court erred when it held that § 1396a(a)(34) requires Ohio to pay for assisted-living services rendered before the approval of a Medicaid beneficiary's service plan. Given that holding, we choose not to address the question whether the district court properly certified the class. Instead we simply vacate the court's certification order.

The district court's judgment is reversed, and the case remanded with instructions to enter judgment in favor of the defendants.